Kenneth GRANT, Appellant

v.

Randa LYNN (Now Heltsley), Appellee.

No. 2007–CA–002193–ME.

Court of Appeals of Kentucky.

Oct. 17, 2008.

As Modified Oct. 24, 2008.

Kenneth D. Grant, Hopkinsville, KY, pro se.

Duncan Cavanah, Hopkinsville, KY for appellee.

Before MOORE, NICKELL and STUMBO, Judges.

## OPINION

NICKELL, Judge.

Kenneth Grant ("Grant"), *pro se*, appeals three orders entered by the Christian Circuit Court on September 27, 2007, October 1, 2007, and October 24, 2007. All three orders pertain to the court finding Randa Lynn Heltsley ("Heltsley") sufficiently proved grandparent visitation with Grant's teenage son and daughter was in the children's best interests. After reviewing the full record and Grant's rambling briefs we affirm.[1]

This is the fourth time these parties have appeared on our docket in Heltsley's six-year quest for grandparent visitation. When we last reviewed the case in 2005, we vacated and remanded the judgment of the Christian Family Court[2] which had denied visitation because Heltsley failed to prove the children would be harmed if they could not visit with their maternal grandmother under *Scott v. Scott*, 80 S.W.3d 447, 451 (Ky.App.2002), *overruled by Vibbert v.*

*Vibbert*, 144 S.W.3d 292, 295 (Ky.App. 2004). Remand was necessary because an *en banc* panel of this Court had since replaced the "harm" standard mandated by *Scott* with the "best interest" standard adopted in *Vibbert*. After rehearing the case, plus several new motions and a constitutional challenge filed by Grant, the trial court found Heltsley had satisfied *Vibbert* and granted her visitation with the children, now fourteen and fifteen, from 10:00 a.m. until 5:00 p.m. on the fourth Saturday of each month and a thirty-minute telephone call with the children every Tuesday evening. Grant has now appealed that ruling to us.

While any wheat in Grant's repetitive and meandering briefs is easily lost in the chaff, we understand him to be asking us to declare KRS[3] 405.021 unconstitutional because it allegedly violates both the federal and state constitutions on its face and as applied, or alternatively, to overturn *Vibbert* and revert to the *Scott* standard. After reviewing the record we will do neither.

Rather than rewrite the long and complex history of this case anew, we quote from the well-written and well-reasoned findings of fact, conclusions of law and final order entered by the trial court after a final evidentiary hearing.

### A. CONSTITUTIONALITY OF KRS 405.021

1. [Grant] has properly challenged the constitutionality of KRS 405.021. [Grant] notified the Kentucky Attorney

---

1. Grant unsuccessfully moved the trial court to stay enforcement of the October 1, 2007, judgment. In March of 2008, Grant moved this Court for a stay pending appeal. That motion was denied because Grant failed to show he or his children would be irreparably harmed by the limited visitation awarded Heltsley during pendency of this appeal.

Based upon the record before us, Heltsley should now be enjoying visitation with her grandchildren for the first time since 2002.

2. *Lynn v. Grant*, No.2004–CA–000298–ME, 2005 WL 1490369 (Ky.App. June 24, 2005).

3. Kentucky Revised Statutes.

General of the challenge, and the Kentucky Attorney General's Office declined to intervene to defend the statute. [Heltsley] filed a response to the constitutional challenge;

2. [Grant] argues that the statute is unconstitutional both on its face and as applied. This Court, however, disagrees. The Court finds that under *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), that the statute passes constitutional muster on all grounds alleged by [Grant]. The Kentucky Court of Appeals in applying *Troxel* to KRS 405.021 has correctly ruled that a "modified 'best interest' standard can be used in cases where grandparent visitation is sought within the constitutional framework of *Troxel*. What *Troxel* requires us [the Court] to recognize is that a fit parent has a superior right, constitutionally, to all others in making decisions regarding the raising of his or her children, including who may or may not visit them." *Vibbert v. Vibbert*, 144 S.W.3d 292, 294 (Ky.App. 2004). Therefore, the court must give appropriate deference to the parent's wishes. However, the parent's wishes are only one factor that the Court must consider in determining what is in the child's best interest[;]

3. The *Vibbert* Court set forth a broad array of factors that the Court must consider. These factors include, but are not limited to, the following: (1) the nature and stability of the relationship between the child and the grandparent seeking visitation, (2) the amount of time the child and grandparent spent together, (3) the potential detriments and benefits to the child from granting visitation, (4) the effect granting visitation would have on the child's relationship with the parents, (5) the physical and emotional health of all the adults involved, grandparents and parents alike,

(6) the stability of the child's living and school arrangements, and (7) the wishes and preferences of the child. *Vibbert*, at 295. The grandparent seeking visitation must prove by clear and convincing evidence that the requested visitation is in the best interest of the child. *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 756, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("the individual interests at stake in a state proceeding are both particularly important and more substantial than the mere loss of money.");

4. This court believes that the *Vibbert* standard in interpreting the relevant sections of KRS 405.021 makes the statute constitutional both on its face and as applied. In addition, the Court finds that all other subsections of KRS 405.021 are constitutional both on their face and as applied. Therefore, this Court hereby upholds the constitutionality of the statute, in toto;

## B. FINDINGS OF FACT AND CONCLUSIONS OF LAW

5. The procedural history of this case is long and complicated. [Grant] was once married to [Heltsley's] daughter Julie Dawn Grant Latham.... Mr. And (sic) Ms. Grant divorced in 1995 and the parties were awarded joint custody of the children with Mr. Grant being the primary residential custodian. In 1999, the Hopkins Circuit Court changed custody of the children to Ms. Latham. This matter went to the Kentucky Court of Appeals (2000–CA–002636–MR)[;]

6. In July 2002, [Heltsley's] husband, Sammy Lynn, passed away from an illness. Six days later, Ms. Latham died during an unrelated surgery. At that point, [Heltsley] sought an ex parte order from the Hopkins Circuit Court granting her emergency custody of the

children.  [Grant] and [she] engaged in a heated custody action in Hopkins County which resulted in [Grant] being awarded sole custody of the children. In August 2002, [Heltsley] filed a "Petition to Establish Visitation Rights" in the Christian Circuit Court, Family Court Division.  [Heltsley] has been actively pursuing visitation with the children since that time[;]

. . .

10.  . . . . Since the undersigned Judge took over this case, [Grant] has engaged in a repeated course of conduct aimed at preventing the Court from conducting a final hearing on this matter. . . . The Final (sic) hearing was scheduled on September 21, 2007.  On September 12, 2007, the Court held oral arguments on the above constitutional challenge of KRS 405.021.  The parties decided to allow the constitutional arguments to be submitted on the record of their written memorandums.  The Court also used this opportunity to conduct a pretrial on this matter.  Neither party raised any real issues regarding the final hearing; 11.  On September 19, 2007, [Grant] is (sic) another effort to prevent the final hearing filed an "Objection" to the hearing taking place on September 21, 2007, due to the pending constitutional challenge.  In addition on the same date, [Grant] filed a "Notice" which [Grant] informed the parties and the Court that he would be two hours late to the hearing on September 21, 2007, and wanted the hearing started late or continued. [Grant] argued in his motion that [his] daughter had a shot scheduled for that date and he had to take her to the doctor.  [Grant] stated that this shot had been scheduled for three (3) months. It should be noted that on August 15, 2007, [Grant] filed a "Notice" objecting to the untimeliness of the [Heltsley's] notice of a hearing.  The court granted [Grant's] motion to continue the hearing due to untimely filing and set the September 12, 2007, hearing.  [Grant] clearly understood that motions have to be timely filed and that motions can be overruled due to lack of timeliness[;]

12.  The court commenced the hearing at (sic) September 21, 2007, at the scheduled time.  The Court overruled both motions as untimely filed.  The Court had given [Grant] the opportunity at the September 12, 2007, hearing to tell the court about any issues and [Grant] never raised his daughter's alleged doctor's appointment.  In addition, [Grant] did not make a requisite showing to the Court that the doctor's appointment could not have been rescheduled for an earlier or later time.  The Court chose to start the hearing at the scheduled time and when [Grant] appeared, the Court chose not to charge or hold him in contempt for his tardiness. In fact, the Court let [Grant] take part in the rest of the hearing and gave him the opportunity to call any witnesses or testify on his own behalf.  [Grant] never stated any objection to the previous testimony before he arrived at the hearing. [Grant] merely asked that the Court consider his testimony given in his Deposition of August 3, 2006.  [Heltsley] did not object, so the court will consider the testimony of record.  [Grant] could have called [Heltsley] in his case in chief if he wished or any other witness of his own, but he chose not to to his own peril. After the hearing, [Grant] filed another untimely "Objection" to the Court having the hearing earlier that day.  The court hereby overrules that objection as untimely and moot. [Grant] had the reasonable opportunity to be heard and voluntarily chose not to appear on time for the scheduled hearing.  [Grant] also filed an "Objection" dated September 28,

2007, which reiterates his previous objections and motions and makes additional arguments. The Court overrules this "Objection." In light of the latest two "Objection[s]" filed by [Grant], the Court is convinced that this was a conscious effort of [Grant] to try to have another appellate issue;

13. The Court will now turn to the main issue at bar: Whether Ms. Heltsley has met her burden to prove by clear and convincing evidence that visitation with her minor grandchildren is in their best interests[;]

14. The first factor the Court must consider is "the nature and stability of the relationship between the child and the grandparent seeking visitation." The Court finds that from the time the children were born in 1992 and 1994, respectively, the children lived in Ms. Heltsley's rental house on her property. The children lived there with Mr. Grant and Ms. Latham until the parents divorced in 1995. During that period, Ms. Heltsley saw the children almost every day with the consent of both parents. When the parents divorced, Mr. Grant was awarded primary custody of the children and continued to live in Ms. Heltsley's rental house with the children. Ms. Heltsley testified that she would babysit the children when [Grant] was at work; and if she could not babysit them, then she would pay for the babysitter. She continued to see the children nearly every day.

When Ms. Latham was awarded custody of the children in 1999, then Ms. Latham moved back into Ms. Heltsley's rental house with the children and remained there until she died. The children continued to see Ms. Heltsley nearly every day during that period. She would take the children on vacation with her and they celebrated Christmas and birthdays primarily at her house. In fact, the children were staying in their bedrooms at Ms. Heltsley's house when Ms. Latham had her surgery which resulted in her death. She was the one who had to inform the children that their mother had died. Ms. Heltsley, after losing emergency custody of the children to Mr. Grant, continued to send the children cards and letters. She seemed very loving and concerned for her grandchildren. The Court finds that this factor strongly weighs in favor of [Heltsley] in support of continued contact with the children being in their best interests;

15. The second factor the court must consider is "the amount of time the children and grandparent spent together." The Court reiterates the findings contained above in Paragraph 14 as if set forth herein in its entirety. The Court finds that prior to the filing of this action in 2002, the children and their grandmother spent a great deal of time together. The court finds that based on the testimony, the relationship the children had with their grandmother was about the only stability the children had for a period of time. The children had a tumultuous few years. First, they lived with both their parents. Then they lived with just their father, [Grant]. Finally, they lived with their mother, their step-father (Steve Latham) and their half-sister, Stephanie Latham. Throughout all these changes, they continued to live in Ms. Heltsley's rental house and continued to have extensive contact with Ms. Heltsley. The Court finds that this factor strongly weighs in favor of [Heltsley] in support of continued contact with the children being in their best interests;

16. The next factor the Court must consider is "the potential detriments and benefits to the children from granting

visitation." The court finds that the only real detriment to the children from having visitation with their grandmother is that it may cause strife between the children and their father. Due [to] the father's vehement defense of this case, the Court does believe that visitation with the grandmother could cause stress to the children and strife between them and their father. However, the Court finds that the benefits to the children would be immense. The children had a very close relationship with their grandmother prior to the filing of this action as shown above. In addition, the children have a half-sister ... which they were close to until they were cut off from contact by [Grant]. [Heltsley] has visitation with [this child] on every other weekend. In addition, [this child] still lives in [Heltsley's] rental house. It is in their best interest to have contact with their half-sister through their grandmother. It is also important and in their best interests for the children to have contact with their deceased mother's side of the family. The Court finds that this factor strongly weighs in favor of [Heltsley] in support of continued contact with the children being in their best interests;

17. The fourth factor for the Court to consider is "the effect granting visitation would have on the children's relationship with the parents." In the present case, it is clear from the record that any effect the visitation would have on the children's relationship with their one remaining parent would be negative. [Grant] has vigorously fought visitation with the children and their grandmother. It is still questionable as to what caused the fallout between the parties. [Heltsley] testified that she believes it was either over her unwillingness to ultimately co-sign a loan to allow [Grant] and her daughter to open a chicken farm or over her fighting [Grant] for custody of the children when Ms. Latham died. [Grant] in his deposition indicates that it was either over [Heltsley's] unwillingness to follow his parental rules in the one visit he allowed in December 2002 or over an alleged affair between him and [Heltsley] many years ago. Whatever the reason, the parties' relationship has broken down and any contact would cause turmoil between the children and their father. Therefore, this factor weighs strongly against the children having visitation with [Heltsley];

18. The next factor the Court has to consider is "the physical and emotional health of all the adults involved, grandparents and parents alike." There is nothing in the record which gives the court concern over either [Heltsley's] or [Grant's] mental or physical health, so the Court considers this to be inconsequential in determining whether it would be in the children's best interests to see their grandmother;

19. The sixth factor the court must consider is "the stability of the children's living and schooling arrangements." There is nothing in the record which gives the Court concern over either their living or schooling arrangements. [Heltsley] did raise a concern as to both of these issues, but stated that because she has not been able to have contact with the children that she has nothing to present to contradict that the children are in a stable living and schooling environment. Therefore, the Court considers this to be inconsequential in determining whether it would be in the children's best interests to see their grandmother;

20. The final factor that the court must consider is "the wishes and preferences of the child." In the present case, neither party called the children to testify.

Therefore, there is no information in the record as to what the children's preferences would be. Therefore, the Court considers this to be inconsequential in determining whether it would be in the children's best interests to see their grandmother;

21. When weighing all the factors, and giving due deference to the father's wishes in this case as required under the *Vibbert* standard, the Court finds by clear and convincing evidence that it is in the best interest of the children to have visitation with their grandmother. Up until just before the filing of this action, [Heltsley] was an integral part of the children's lives. This was with the consent of [Grant] during the years that [Grant] lived on [Heltsley's] property— both while married to Ms. Latham and after their divorce. In addition, [Grant] in his deposition when asked if a half day visitation per month would be harmful to the children stated "I would probably consent to a half day a month." Deposition of [Grant], p. 41, line 7. When asked whether telephonic communication with the children would harm him or his relationship with the children, [Grant] replied, "As long as they weren't harassing phone calls constantly and as long as nothing was said that upset the children or things of that nature and she's not wanting to call my house every day or every other day. I mean if she acts respectful and decent and proper." *Id.*, at p. 42, lines 3–7;

22. Moreover, it is in the children's best interest to have contact with their deceased mother's side of the family. The children have a half-sister which they were close to when Ms. Latham was still alive. The children need to revive the contact with their half-sister to allow them to have as normal a relationship as possible under the circumstances. The Court is going to limit contact to one phone call a week and one half day visitation per month. The court does not believe with such limited contact that [Heltsley] can do anything which would interfere with [Grant's] ability to raise and nurture the children as he wishes.

. . .

IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

a. [Heltsley's] "Petition to Establish Visitation Rights" is GRANTED. [Grant] is ordered to meet with [Heltsley] the fourth Saturday of the month at 10:00 AM C.S.T., at the gas pumps at the Hopkinsville Wal–Mart on Clinic Drive. The children are to be the only ones to get out of the vehicle and any instructions as to the children's medical needs or dietary needs is to be in writing and transferred to [Heltsley] by the children in an envelope. [Heltsley] is to return the children to [Grant] at 5:00 PM C.S.T., at the same location and any information that [Heltsley] needs to get to [Grant] shall be in the same manner as above;

b. [Heltsley] shall have the right to contact the children by telephone for a period of thirty minutes every Tuesday evening at 7:00 PM C.S.T. [Grant] shall make the children available for this phone conversation. If the children are unable to take the phone call due to an extracurricular activity, then the phone call shall take place the next evening at the same time (Wednesday);

c. At no time shall either party discuss this litigation with the children nor shall they criticize or talk negatively about the other party in front of the children. Any limited contact that the parties may have as a result of the visitation exchanges or over the phone shall be cordial and not abusive or harassing.

[Heltsley] is ordered to follow the medical and dietary directives of [Grant] relative to the children;

d. [Grant's] oral "Motion to Dismiss for Failure of [Heltsley] to Meet her Burden" made at the Final Evidentiary Hearing is hereby OVERRULED[;]

e. [Grant] made a Motion at the Final Hearing for an Injunction staying the Court's ruling if the Court granted [Heltsley] relief. The Court has considered [Grant's] Motion and OVERRULES the Motion. The Court finds that due to the limited amount of contact in the above order that there is no irreparable injury to allow the visitation to take place. In fact the Court finds the opposite. Due to the amount of time this litigation has taken to make it to this point, the children may suffer irreparable injury if they do not begin having some contact with [Heltsley] and their half-sister. Therefore, the injunction is denied;

f. The phone calls shall commence on Tuesday, October 16, 2007, and the first visit shall commence on Saturday, October 27, 2007;

g. The Court has considered all other Motions and arguments of the parties, and any motion or argument not addressed specifically by the court has been considered and is hereby OVERRULED;

THERE BEING NO JUST CAUSE FOR DELAY, THIS IS A FINAL AND APPEALABLE DECISION.

First we comment on whether this appeal is properly before us. CR[4] 76.12 establishes various requirements for briefs filed in this Court. They are to be a maximum of twenty-five pages and double-spaced with a left side margin of one and a half inches and a one inch margin on all

other sides. The statement of the case is to cite relevant documents in the record and identify their precise location by page number or citation to the video record. Similarly, the argument is to reference supporting documents in the trial court record.

Grant is a *pro se* litigant. As such, he has asked us to hold him to a lesser standard than the one we apply to practicing members of the bar. *See Million v. Raymer,* 139 S.W.3d 914, 920 (Ky.2004). Grant's brief is deficient in many ways. While it is twenty-five pages in length, it is also hand-written, single-spaced without regard for margins, and contains wholly inadequate citation to the record. We respect Grant's choice to represent himself and recognize our custom of relaxing the rules for *pro se* litigants within reason. However, Grant's woefully deficient briefs border on being abusive to us and unfair to Heltsley. Grant has completed some college coursework and has demonstrated familiarity with the civil rules. While we would be well within our authority to strike his briefs for noncompliance with CR 76.12, *Elwell v. Stone,* 799 S.W.2d 46, 47–8 (Ky.App.1990) (citing 7 Bertelsman and Phillips (sic), Kentucky Practice, CR 76.12(4)(c)(iv) [now (v)], Comment 4 (4th ed. 1989 PP)) and CR 61.02, or to order him to file a corrected brief, or to review his arguments solely for manifest injustice, we will impose none of these sanctions at this time. However, we do place Grant on notice that submission of any future filings not conforming to the rules of court in general, and to CR 76.12 in particular, may result in dismissal of his appeal or the striking of his briefs.

On appeal, Grant contends the trial court misapplied the seven factors enumerated in *Vibbert, supra,* and alleges KRS

4. Kentucky Rules of Civil Procedure.

405.021 is unconstitutional on many grounds besides the due process challenge discussed in *Vibbert* and *Troxel*. In contrast, Heltsley urges us to affirm the award of grandparent visitation because the trial court correctly applied the *Vibbert* factors and required her to clearly and convincingly prove visitation was in the grandchildren's best interest. Heltsley also argues KRS 405.021 has survived all prior constitutional attacks and Grant's current challenge should be rejected because it presents nothing new.[5]

■ We will not reverse a trial court's award of visitation unless it constitutes "a manifest abuse of discretion, or [was] clearly erroneous in light of the facts and circumstances of the case." *Drury v. Drury*, 32 S.W.3d 521, 525 (Ky.App.2000) (citing *Wilhelm v. Wilhelm*, 504 S.W.2d 699, 700 (Ky.1973)). After reviewing the entire record, we see no basis for holding the trial court abused its discretion or committed clear error in allowing Heltsley to visit with her grandchildren from 10:00 a.m. until 5:00 p.m. one day a month and to speak with the children by telephone for half an hour one evening each week.

■ Grant first argues he is a fit custodial parent and should be permitted to raise his children sans contact with or interference by his former wife's family. No one has argued Grant is an unfit parent and no such finding was made by the trial court. The court simply found it would be in the best interests of the children to have contact with the family of their late mother, especially since they had spent much time in the care of their maternal grandmother until Grant ceased all

contact in 2002 and Heltsley was the one stabilizing factor in their lives. Further, the children's once strong bond with a younger half-sister was broken by Grant's refusal to allow them to see one another.

Contrary to Grant's view, both the United States Supreme Court in *Troxel, supra,* and this Court in *Vibbert, supra,* have upheld the award of grandparent visitation. Grant's argument has not persuaded us to reconsider *Vibbert* or to revert to *Scott.* Furthermore, in reading the trial court's thorough opinion, we are convinced our mandate in *Vibbert* was followed in full and all seven factors enumerated in our opinion were considered and correctly applied. We construe the trial court's use of the word "inconsequential" in describing its evaluation of three of the factors as meaning evidence of those factors was considered, but not deemed strong enough to sway the court one way or another. After reviewing the entire record, including Grant's deposition in which he acceded to limited visitation between Heltsley and the children, and the trial court's well-turned opinion, we are confident the court's findings are supported by substantial evidence and the visitation terms are sufficiently tailored to preserve Grant's desire to raise his children as he sees fit but to also allow the children to renew contact with their late mother's family, especially their younger step-sister.

Grant's second argument is KRS 405.021, which authorizes a court to award visitation to a grandparent when it is in the child's best interest to do so, is unconstitutional. *Vibbert* and *Troxel* address grandparent visitation primarily in terms

---

**5.** Since 2004, only one case, *VanWinkle v. Petry,* 217 S.W.3d 252 (Ky.App.2007), has been published on grandparent visitation. In that case we declined to address a claim that KRS 405.021 was unconstitutionally vague because we vacated the case on other grounds. We held the trial court had erroneously granted additional grandparent visitation absent a request, evidence or a finding that extra time with them was in the best interests of the children.

of due process, but Grant alleges the statute is unsound, both facially and as applied, for many more reasons. In his brief he asks us to declare the statute:

> unconstitutional under both federal and state constitutional articles and amendments (1)(2)(3)(5)(9) and (14) as a whole or individually, both facially and applied, further violative of Due Process, privacy, privileges and immunities, confrontation, as well as impermissibly vague, overly broad and void as a matter of public policy, and even further failing substantially to advance any legitimate state interest or in the alternative unreasonable means of advancing any interest as related to otherwise fit parents.

He also suggests the statute fails to provide equal protection and does not allow fit parents to raise their children and determine with whom their children associate. From our review of Grant's muddled allegations, it appears he has combed dozens of legal opinions and strung together a jumble of sentences that do not warrant striking down a statute that has previously withstood constitutional muster, especially when Grant offers no explanation as to how KRS 405.021 supposedly violates any of the quoted constitutional provisions. While we are willing to overlook inartful pleading by a *pro se* litigant, we are not willing to create an argument for him. A shotgun blast of random legal jargon and indiscriminate reference to a hodgepodge of legal authority does not a focused or articulate argument make, and such abusive practice misses any reasonable appellate mark or purpose.

For the foregoing reasons, we affirm the findings of fact, conclusions of law and final order of the Christian Circuit Court.

ALL CONCUR.